**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| **LINDA S. GLANDER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:05-CV-00170** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Linda S. Glander, who is *pro se*, appeals to the district court from a final

decision of the Commissioner of Social Security ("Commissioner") denying Glander's

application for a period of disability and disability insurance benefits ("DIB").[1] (*See* Docket # 4.)

For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

On January 23, 2003, Glander applied for DIB, alleging that she became disabled as of

October 27, 2002, due to fractures of her left ankle in 1989 and fractures of her right ankle and

foot in 1998.[2] (Tr. 60-69.)  After Glander filed her initial application, she also reported reduced

visual acuity, sinus problems, depression, and a pinched nerve in her left arm. (Tr. 82, 90.)  On

March 24, 2004, Administrative Law Judge (ALJ) Marilyn S. Mauer conducted a hearing at

which Glander, who was represented by counsel, and a vocational expert testified. (Tr. 384-415.)

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] Glander became insured for DIB as of October 1, 2002. (Tr. 53.)

At the hearing's conclusion, Glander's list of alleged ailments also included hand arthritis, back

pain, and chronic incontinence. (Tr. 338-39, 395, 399.)  On December 23, 2004, the ALJ

rendered an unfavorable decision to Glander, concluding that she could return to her past work

as production assembler as she performed it. (Tr. 12-26.)

Following the Appeals Council's denial of Glander's request for review, the ALJ's

decision became the final decision of the Commissioner. (Tr. 4-6.)  On May 20, 2005, Glander

filed a complaint with this Court, seeking relief from the Commissioner's final decision. (Docket

# 1.)  This appeal became ripe for the Court's review on December 13, 2005. (*See* Docket # 11,

14, 15, 17.)

## II.  THE PARTIES' POSITIONS

Glander conclusorily asserts that the Commissioner's decision to deny her DIB was

erroneous and not supported by substantial evidence. (Docket # 4.)  Glander, however, utterly

fails to point to any alleged errors by the ALJ with particularity or advance any specific

arguments in support of her appeal. (*See* Pl.'s Opening Br. 1-3; Pl.'s Reply Br. at 1.)

In contrast, the Commissioner contends that substantial evidence supports her decision to

deny DIB to Glander.  Specifically, the Commissioner asserts that the ALJ (1) reasonably

assessed the severity of Glander's impairments, (2) assigned her an appropriate residual

functional capacity (RFC), and (3) properly determined that the assigned RFC did not prevent

Glander from engaging in her past work as a production assembler as she performed it. (Mem. in

Supp. of Commissioner's Decision at 12-19.)

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.* Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV.  THE LAW

To be considered disabled under the Social Security Act, a claimant must establish that he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A). The impairment must be severe, causing the claimant to be unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505 - 1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[3] 20 C.F.R. §

404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative

answer leads either to the next step or, on steps three and five, to a finding that the claimant is

disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).  A negative answer at any

point other than step three stops the inquiry and leads to a finding that the claimant is not

disabled. *Id.*  The burden of proof lies with the claimant on every step except the fifth, where it

shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## V.  APPLICATION AND ANALYSIS

### A.  <u>The Facts</u>[4]

#### 1.  *Glander's Background and Daily Activities*

Glander was sixty-one years old at the time of the ALJ's decision and a high school

graduate. (Tr. 45, 67, 389.)  Most of her adult life, Glander worked in the manufacturing

industry, first as a parts assembler for twenty-seven years (1965 to 1992), then in a variety of

---

[3] Before performing steps four and five, the ALJ must determine the claimant's RFC, or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

[4] The administrative record in this case is voluminous (415 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

factory positions for two years (1992 to 1994), and most recently as a press operator for eight years (1994 to 2002). (Tr. 62, 73.)  As a parts assembler, Glander manipulated lightweight parts with her hands from a sitting position, although once every ten days she spent a day walking between work stations, and "every once in a while" lifted baskets of parts weighing twenty to twenty-five pounds. (Tr. 389-92.)  In contrast, her work as a press operator with Tower Automotive primarily required her to stand to perform her duties. (Tr. 393.)

In April 1998, Glander fractured her right foot and ankle in an automobile accident, causing her to be off work for twenty-one months. (Tr. 393.)  After rehabilitation, Glander was released on December 10, 1999, to return to "all work activities except for prolonged standing." (Tr. 165.)  Glander then returned to work at Tower Automotive, reporting "it wasn't too bad because there were some jobs [she] could sit down at." (Pl.'s Opening Br. at 2.)  However, she reports that "gradually those jobs were no longer available so [she] was standing 8 or 10 hours a week." (Pl.'s Opening Br. at 2.)  Ultimately, effective October 27, 2002, Glander resigned her employment with Tower Automotive, explaining that "the pain in [her] ankles, feet, and back, was so unbearable, [she] could no longer stay on [her] feet to perform [her] job." (Tr. 61.)  She has not since returned to the workforce. (Tr. 389.)

As to her activities of daily living, Glander lives alone and independently cares for her basic needs such as bathing, dressing, and food preparation; she also obtains her own groceries, visits family members, frequents the library, swims at the YMCA, crochets, does her own laundry, and performs her housework "somewhat herself," calling upon her daughter to help if needed. (Tr. 84-87, 94-96, 388, 400-02, 405.)

Glander reports that she can stand about two to three minutes and walk about ten minutes before she feels pain in her foot, a pain she describes as a "two" on a scale from one to ten with ten being pain so great that it would cause her to go to the hospital. (Tr. 396.)  Glander states that she can sit uninterrupted for only twenty to thirty minutes because her lower body "get[s] a little numb"; she admits that she is not being treated for anything that would account for such condition. (Tr. 397.)  She further verbalizes that she must sit with her legs elevated at certain times, but does not point to a physician's order requiring her to do so. (Tr. 394, 407.)

When Glander was asked by the ALJ what prevents her from returning to "one of those sit down assembly jobs" that she performed for twenty-five years, Glander cited her purported need to elevate her legs, hand arthritis, and an inability to sit uninterrupted for eight hours a day. (Tr. 394-95, 397.)

### 2. Summary of Glander's Pertinent Medical History

In applying for DIB, Glander reports the following ailments: (1) pain arising from ankle and foot fractures, (2) depression, (3) reduced visual acuity, (4) sinus congestion, (5) pinched nerve in her left arm, (6) chronic incontinence, (7) back pain, and (8) arthritis in her hands.[5]

a.  Ankle and Foot Pain

Glander visited Dr. Barry W. Liechty, an orthopedic surgeon, on August 27, 2001, reporting intermittent pain in her right ankle and foot, particularly with walking, and "want[ed]

---

[5] As to her pinched nerve, on May 1, 2003, Glander complained of numbness in her left fourth and little fingers to her treating family practitioner, Dr. Shipe, but he recorded no impairment of any kind upon examination. (Tr. 215.)  As to her chronic incontinence, Glander was prescribed medication by Dr. Craig Hamilton on February 13, 2003, and she reported approximately six weeks later that she was "doing well – wonderful." (Tr. 338-39.) Glander has not sought treatment for either her alleged back pain or hand arthritis. (Tr. 395, 399.)

6

restrictions." (Tr. 178-79.)  Upon examination and X-ray, Dr. Liechty found that Glander's ankle felt solid and that she had good motion. (Tr. 178-79.)  He opined that she probably would benefit from not working more than a 48-hour work week, but prescribed no physical restrictions. (Tr. 178-79.)

Glander visited Dr. Liechty again on January 25, 2002, due to pain in her ankles and foot. (Tr. 175.)  Dr. Liechty again found that Glander had good motion in both of her ankles, stable ligaments, and no point tenderness. (Tr. 175.)  He reported that her X-rays "look[ed] very good," observing no mal-alignment. (Tr. 175.)  He recommended over-the-counter Ibuprofen or Aleve for pain, and further opined that in the long term Glander may want to look for a "sit-down" job due to her lower extremity discomfort. (Tr. 175.)

On September 23, 2002, Dr. Terry Shipe, Glander's family physician, completed a medical examination for Indiana Vocational Rehabilitation, where he opined that Glander should avoid jobs that require "prolonged standing/walking." (Tr. 220-21.)

On March 13, 2003, state agency physician Dr. A. Landwehr reviewed Glander's record and opined that Glander could lift twenty pounds occasionally, could lift ten pounds frequently, and could stand or walk for approximately six hours and sit for six hours in an eight-hour day. (Tr. 229.)  Dr. Landwehr further concluded that Glander could climb ramps/stairs occasionally, but never climb ladders/ropes/scaffolds. (Tr. 230.)  Dr. Landwehr's opinion was affirmed by Dr. J. Sands. (Tr. 235.)

On April 28, 2003, Dr. Venkata Kancherla examined Glander at the request of the state agency. (Tr. 207-10.)  Upon examination, Dr. Kancherla noted that Glander was 70½ inches tall

and weighed 250 pounds, concluding that she was morbidly obese. (Tr. 208-09.)  He found that

her right ankle had no swelling or tenderness, and her ankle range of motion was normal. (Tr.

208.)  He further reported that both her gait and muscle strength in her legs were normal. (Tr.

209.)

On October 2, 2003, within one week after her DIB application was denied upon

reconsideration (Tr. 31), Glander visited Dr. Shipe for a "disability physical," complaining that

she was having "increasing symptoms." (Tr. 295.)  At her visit, Glander reported that she now

could stand for only a few minutes due to her right ankle/foot pain and could only walk two

blocks. (Tr. 295.)  Upon examination, he found that she had decreased range of motion in her

right foot, but better range in her right ankle. (Tr. 295.)

On February 19, 2004, Dr. Shipe completed a physical residual functional capacity

questionnaire at Glander's request. (Tr. 376-80.)  He reported that she suffered from anxiety,

bilateral ankle/foot pain, shoulder pain, and allergies. (Tr. 377-78.)  He represented that her

symptoms would constantly interfere with her attention and concentration during the workday

and that she was incapable of even low stress jobs; he further opined that Glander could sit for

twenty minutes at a time and four hours total, stand for five minutes at a time, stand or walk for

less than two hours in an eight-hour workday, and lift less than ten pounds occasionally. (Tr.

377-78.)  He also stated that she would likely be absent from work more than four days a month

due to her impairments. (Tr. 379.)

Upon further inquiry to Dr. Shipe, he admitted that in completing the questionnaire he

simply recorded Glander's answers to the questions posed on the form, believing her answers to

be "truthful" and "correct" (Tr. 382, 404); in fact, on the questionnaire, he noted that the reason for his conclusion that Glander was incapable of even low stress jobs was "patient's statement." (Tr. 377.)  He cited no objective testing to support the limitations he recorded, even after he was re-contacted at the ALJ's request. (Tr. 383.)

    b.  Cognition and Mental Health

At the referral of her vocational rehabilitation counselor after her automobile accident, Glander underwent a psychological assessment by James A. Cates, Ph.D., in August 1999. (Tr. 314-19.)  Intelligence testing placed her in the average range. (Tr. 318.)  Psychologist Cates found that, while Glander might be experiencing situational depression and anxiety, it did not appear to be long term. (Tr. 318.)

In fall of 2000, Glander underwent three counseling sessions for psychosocial stressors; by the third session her counselor observed that she was "improved." (Tr. 253.)  In February 2002, Glander again participated in a counseling session due to grief at the loss of her boyfriend; one month later on her second visit, the counselor found her mood was better. (Tr. 190.)  Later in 2002, Glander again sought out several counseling sessions, reporting that she hated her job and that she was anxious. (Tr. 190, 250.)

In March 2003, Glander's vocational counselor commented that Glander had trouble remembering concepts when taught to her, but believed it to be related to the medication she was taking. (Tr. 305-06.)

On March 14, 2003, state agency psychologist W. Shipley, Ph. D., reviewed Glander's record. (Tr. 236-48.)  He concluded that she had mild limitations in daily living, social

functioning, and maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (Tr. 246.)  While Psychologist Shipley noted the stress and anxiety that Glander reported to her physician, he found Glander's activities of daily living did not suggest serious limitations and that her medication (Zanax) helped effectively manage her symptoms. (Tr. 248.)

c.  Reduced Visual Acuity

On November 21, 2000, Glander underwent surgery by Dr. Sandra Chern for repair of a retinal detachment in Glander's left eye. (Tr. 326.)  On December 20, 2001, Dr. Chern reported that Glander was doing very well, had visual acuities of 20/40 OD and 20/30 OS, and had incurred no long term complications from the detachment. (Tr. 321.)

On October 23, 2002, Glander underwent surgery for a mature cataract in her right eye. (Tr. 197.)  On September 9, 2003, Glander told her ophthalmologist that her visual acuity was stable since her cataract surgery. (Tr. 259.)  On March 14, 2003, Dr. Sands opined in a physical residual functional capacity assessment that Glander had no visual limitations. (Tr. 231.)

d.  Sinus Congestion

During 2002 to 2003, Glander was treated frequently by Dr. Shipe for sinusitis. (Tr. 215-16, 218, 222, 224, 295-96.)  During a work capacity evaluation on September 23, 2002, Dr. Shipe assigned a diagnosis of "chronic sinusitis" to Glander and recommended that she avoid working in dirty air environments. (Tr. 221.)

On November 25, 2002, Dr. Thomas Dumas, a sinus specialist, examined Glander at the request of Dr. Shipe following Glander's complaints of head pressure and congestion. (Tr. 302.)

Upon examination, he found that her nasal septum was deviated, but otherwise his findings were unremarkable; he ordered a CT scan for further evaluation. (Tr. 302.) One month later, the CT scan results indicated no significant sinusitis, and Dr. Dumas concluded upon re-evaluation that Glander was "totally within normal limits." (Tr. 219.) He noted that he thought Glander had improved somewhat since quitting her job as a press operator. (Tr. 219.)

On March 14, 2003, Dr. Landwehr concluded that Glander should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 232.)

### 3. Summary of Vocational Expert Testimony

Dr. Robert Barkhaus, a vocational expert, testified at Glander's hearing at the request of the Commissioner. (Tr. 408-14.) According to Dr. Barkhaus, Glander's past jobs in the manufacturing industry were classified as light work, with the exception that her work as an assembler, because it was performed primarily from a sitting position, was considered sedentary from a postural standpoint. (Tr. 409.)

The ALJ asked Dr. Barkhaus to consider an individual with Glander's age, education, and experience, who could lift twenty pounds occasionally and ten pounds frequently; stand for no more than two hours in an eight-hour workday; sit at least six hours in an eight-hour workday; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, crouch, and crawl; is required to elevate her feet about twelve to eighteen inches; and have no concentrated exposure to fumes, odors, dusts, gases, or poor ventilation. (Tr. 410.) Dr. Barkhaus testified that an individual with such RFC could perform Glander's past relevant jobs as a production worker and assembler as she performed them

11

primarily from a sitting position. (Tr. 410.)

The ALJ then asked Dr. Barkaus to consider whether this same individual could perform her past relevant work if she had a memory problem that made learning new tasks difficult. (Tr. 411.)  Dr. Barkhaus concluded that such a memory problem would not interfere with the performance of the work because it was unskilled and involved only simple, repetitive tasks. (Tr. 412.)  In response to questioning by Glander's counsel, Dr. Barkhaus commented that an individual cannot engage in competitive employment if she misses four or more days of work each month. (Tr. 413.)

### 4.  The ALJ's Decision

Nine months after the hearing, the ALJ rendered an unfavorable decision to Glander. (Tr. 12-26.)  The ALJ found at step one of the five-step analysis that Glander has not engaged in substantial gainful activity, and at step two that Glander's healed lower limb fractures and obesity satisfy the basic severity threshold.[6] (Tr. 25.)  However, at step three, the ALJ determined that Glander's impairments were not severe enough to meet a listing; thus, she assigned an RFC and proceeded to step four. (Tr. 22.)  At step four, the ALJ determined that Glander had the RFC to perform her past relevant work as a production assembler as she performed it. (Tr. 26.)  Accordingly, the ALJ concluded that Glander was not disabled and thus was not entitled to DIB payments. (Tr. 26.)

---

[6] While Glander never alleged obesity as a basis for her disability, the ALJ afforded her this diagnosis throughout her determination based upon the medical evidence of record indicating Glander's obesity. (*See* Tr. 207); *see generally Skarbek v. Barnhart*, 390 F.3rd 500, 504 (7th Cir. 2004) ("Although [claimant] did not specifically claim obesity as an impairment (either in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment"); Social Security Ruling (SSR) 02-1p at 3 ("[W]e will use our judgment to establish the presence of obesity based on the medical findings and other evidence in the case record. . . .").

### B.  **The Analysis**

*1.  At Step Two, the ALJ Committed a Harmless Error
in Analyzing the Severity of Glander's Impairments*

At step two of the five-step analysis, the ALJ analyzed each of Glander's impairments in turn, ultimately concluding that Glander's healed lower limb fractures and obesity constitute severe impairments under the Act.  However, in performing the analysis, the ALJ erred by solely considering Glander's impairments individually, rather than in combination.

"When assessing the severity of multiple impairments, the adjudicator must evaluate the combined impact of those impairments on an individual's ability to function, rather than assess separately the contribution of each impairment to the restriction of function as if each impairment existed alone." SSR 86-8 at 2; *see also Lopez-Navarro v. Barnhart*, 207 F. Supp. 2d 870, 884-85 (E.D. Wis. 2002); 20 C.F.R. § 404.1523; SSR 85-28 at 3.  Here, the ALJ thoroughly discussed in turn Glander's complaints of healed lower extremity fractures, back pain, reduced visual acuity, left arm pinched nerve, urinary urge incontinence, and depression, but never indicated she considered their combined impact on Glander's ability to function.[7] (*See* Tr. 20-22); *see generally Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (stating that an ALJ must sufficiently articulate the ALJ's assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced).

---

[7]Although the ALJ did not specifically discuss Glander's complaints of sinusitis in her second step analysis, later in the opinion she referred to her conclusion that Glander's sinusitis was not a severe impairment. (Tr. 22); *see generally Perez v. Barnhart*, No. 02 C 6876, 2003 WL 22287386, at *9 (N.D. Ill. Sep. 30, 2003) (explaining that, because the ALJ found other severe impairments and continued to the third step of the analysis, the ALJ's failure to identify one of the claimant's ailments as severe did not constitute reversible error).

Nonetheless, the ALJ's error was not fatal.  Since she ultimately concluded that Glander's healed lower extremity fractures and obesity constituted severe impairments, and thus proceeded to step three on such basis, the error was harmless and does not constitute grounds for reversal. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).

> ### 2.  The ALJ's Determination at Step Three that Glander's Impairments
> ### Do Not Meet a Listing is Supported by Substantial Evidence

At step three, the ALJ considered Glander's healed lower limb fractures and obesity, both singly and in combination, and determined that these impairments were not severe enough to meet a listing.  Upon review of the record, the ALJ's finding at step three is supported by substantial evidence.

To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment. *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999).  The claimant bears the burden of proving her condition meets or equals a listed impairment. *Id*.  When a claimant has several medical problems, the ALJ must consider the claimant's condition as a whole. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802-03 (7th Cir. 2005).  Specifically, a claimant's obesity must be considered in combination with the claimant's other impairments. *Id*.; *see also* SSR 02-1p at 4-5.

Here, the ALJ properly considered Glander's healed lower limb fractures in combination with her obesity.  Specifically, the ALJ contemplated Listing 1.02A and noted that the medical evidence fails to indicate that Glander has any of the requirements necessary to meet such listing:

14

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s) . . . . resulting in inability to ambulate effectively.[8]

20 C.F.R. § 404, Subpart P, App. 1, 1.02.

Dr. Liechty, Glander's orthopedic surgeon, opined that Glander had good motion in her ankles and that her X-rays "look[ed] very good," with no mal-alignment. (Tr. 175.)  Dr. Kancherla's examination results were consistent with Dr. Liechty's – that Glander's gait, range of motion, and muscle strength in her legs were normal, noting no swelling or tenderness in her ankles. (Tr. 208-09.)  Furthermore, Glander testified that she ambulates without any assistive devices and performs all of her activities of daily living independently, including traveling to the YMCA for swimming, performing grocery shopping, and visiting the library.  Clearly, Glander falls utterly short of meeting the applicable listing and thus fails to carry her burden at this third step.

*3. The ALJ's Assessment of Glander's RFC is Supported by Substantial Evidence*

Before proceeding to step four of her analysis, the ALJ determined Glander's RFC:

> Ms. Glander retains the residual functional capacity to perform work that involves lifting/carrying 20 pounds on an occasional basis and 10 pounds on a frequent basis; standing/walking for two hours during an eight-hour period; sitting for six hours during an eight-hour period; and engaging in postural activities on an

---

[8] An inability to ambulate effectively is defined as "an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 404, Subpart P, App. 1, 1.00B2b(1).  Examples of ineffective ambulation include an inability to walk without a walker or two crutches, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, and the inability to carry out routine ambulatory activities, such as shopping and banking. 20 C.F.R. § 404, Subpart P, App. 1, 1.00B2b(2).

occasional basis with the exception of a preclusion from climbing . . . .  In
deference to Ms. Glander's subjective allegations of limitation due to a history of
sinus problems, I adopt the DDS conclusion that she should avoid work that
involves exposure to pulmonary irritants such as fumes, odors, dusts, and gases . .
. .  In further deference to Ms. Glander's subjective allegations of limitation due
to foot/ankle pain . . . , I find that she should work in a setting where she is able to
elevate her feet 12 to 18 inches underneath a table despite the minimal objective
support for such a restriction.

(Tr. 22.)  In arriving at Glander's RFC, the ALJ considered Glander's limitations and restrictions

arising from both severe and non-severe impairments, *see* SSR 96-8p, ultimately aligning her

RFC with the opinions of Dr. Liechty, Dr. Kancherla, Dr. Landwehr, and Dr. Sands, discounting

(1) Glander's testimony that her limitations prevent her from performing even sedentary work,

and (2) the opinion of Dr. Shipe.

      a.  <u>The ALJ Properly Determined that Glander's Testimony About Her
Limitations Was Not Entirely Credible</u>

An ALJ is in the best position to observe a witness's demeanor, thus a reviewing court

should not upset her credibility determinations unless they lack any support in the record or are

patently wrong. *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  Here, the ALJ's decision to

discount Glander's subjective complaints of why she could not perform her past sedentary work

was not without support or patently wrong.

Glander stated that she could not return to sedentary work because she needs to elevate

both of her legs, suffers from lower body numbness after sitting for twenty to thirty minutes, and

has arthritis in her hands.  The ALJ properly noted that Glander was never diagnosed with hand

arthritis, no evidence in the medical record indicates that Glander ever complained of these

symptoms to any medical professional (except Dr. Shipe's physical capacity assessment to be

16

discussed *infra* reflecting Glander's subjective complaints), and she never alleged hand arthritis

as a reason for her disability on her DIB application; therefore, the ALJ discounted Glander's

perceived limitation of her hands. *See Maxwell v. Sullivan*, 792 F. Supp. 582, 591 (N.D. Ill.

1992) (denying DIB based on subjective symptoms, when objective medical evidence fails to

show a medical condition that would reasonably be expected to cause the subjective symptoms).

Likewise, the ALJ discounted Glander's testimony that she is unable sit for more than twenty to

thirty minutes before experiencing numbness in her lower body, finding it unreasonable that

Glander had never mentioned this symptom to her physician if she was experiencing such global

symptomology. *Id.*  Similarly, Glander's perceived need to elevate her legs while sitting is not

supported by objective medical evidence, other than Dr. Shipe's reiteration in his physical

capacity assessment of Glander's standard practice at home.  Nonetheless, the ALJ incorporated

Glander's practice of elevating her legs into the RFC, offering her subjective limitations *even

greater* credence than is supported by objective medical evidence.

The ALJ also discounted Glander's complaints of foot and ankle pain, noting that her

physicians have not prescribed any medication or other conservative intervention for pain

management. *Schmidt v. Barnhart*, 395 F.3d 737, 746-57 (7th Cir. 2005); *see also* SSR 96-7p at 7

("Persistent attempts by the individual to obtain relief of pain or other symptoms . . . generally

lend support to an individual's allegations of intense and persistent symptoms.").  Furthermore,

the ALJ noted that Glander's performance of her activities of daily living are inconsistent with

her pain and perceived limitations, as she independently performs cooking, laundry, swimming,

aerobic exercise, and at times cares for her grandchildren. *See Schmidt*, 395 F.3d at 747.  The

17

ALJ also observed a conflict between Glander's testimony, stating that her pain and limitations were so great that she could not perform any sedentary work, and Glander's statement on her Indiana Workforce Development Determination of Eligibility that she was "able, available, and actively seeking" work. (Tr. 57.)  This discrepancy gave the ALJ a valid reason to suspect that Glander's complaints of pain and limitation were exaggerated, indicating perhaps a willingness on Glander's part to tweak her story as is necessary to meet the relevant benefactor's requirements. *See Schmidt*, 395 F.3d at 746 (regarding claimant's "unemployment experience as one of many factors adversely impacting his credibility").

Given the medical evidence contradicting Glander's assertion that her pain and limitations prevent her from performing even sedentary work, and given the ALJ's legitimate concerns about Glander's possible exaggeration of her symptoms, the ALJ's decision to discount Glander's testimony cannot be considered "patently wrong." *See Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000) (finding credibility decision not patently wrong where "[t]he discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating her condition"); *Benson v. Massanari*, No. 00 C 2085, 2002 WL 1759825, at *8 (N.D. Ill. 2002) ("It is clear from the ALJ's discussion that he weighed the objective signs against the symptoms reported by plaintiff and did not err in holding that the lack of objective evidence trumped plaintiff's subjective complaints.").

      b. The ALJ's Discounting of Dr. Shipe's Opinion Was Supported by Substantial Evidence

Likewise, in determining Glander's RFC, the ALJ's decision to give little weight to the opinion of Dr. Shipe is also supported by substantial evidence.  The Seventh Circuit has stated

that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and  circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).  However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).[9]  Furthermore, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner, *id*.; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1).  Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ gave a plethora of good reasons why she gave little weight to the opinion of Dr. Shipe.  First, no objective tests or findings to support Dr. Shipe's physical capacity assessment are noted in the record, and Dr. Shipe admitted that he based his assessment on Glander's subjective statements. (Tr. 377, 382); *see Dixon*, 270 F.3d at 1178 ("An ALJ may

---

[9] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations.").  Furthermore, the ALJ took note of Dr. Shipe's history of frequently authorizing extended periods of sick leave to Glander based upon her myriad of sinus complaints, fatigue, and diarrhea; observing that while Glander was on sick leave for diarrhea, she fractured her ribs riding a bicycle, resulting in yet more sick leave authorized by Dr. Shipe. (Tr. 222); *see generally Dixon*, 270 F.3d at 1177 (cautioning that a treating physician may bring biases to the disability evaluation and find disability too quickly, wanting to do a favor for his patient).

Moreover, the ALJ noted inconsistencies between Dr. Shipe's assessment of Glander's pain and limitations *after* Glander's application for DIB was denied upon reconsideration (Tr. 295, 376-80) and Glander reported "increasing symptoms," when compared with Dr. Shipe's earlier records, which infrequently mentioned foot/ankle pain and merely recommended that Glander avoid jobs that require "prolonged standing/walking." (Tr. 215-16, 218, 220-22, 224.) The ALJ also observed inconsistencies between Dr. Shipe's physical capacity assessment and the evaluations opined by Dr. Liechty and Dr. Kancherla. *See Books*, 91 F.3d at 979  ("Nothing . . . mandates that the opinion of a treating physician always be accepted over that of a consulting physician, only that the relative merits of both be duly considered."); *Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992) (emphasizing that a consulting physician may bring both impartiality and expertise to the claim, possessing knowledge of similar cases).  Clearly, the ALJ's conclusion that Dr. Shipe's assessment was not entitled to significant weight in her determination of Glander's RFC is supported by substantial evidence.

*4.  The ALJ's Determination at Step Four that Glander Could Perform Her Past Job as an Assembler as She Performed It Is Supported by Substantial Evidence*

20

At step four of the five-step analysis, the ALJ is required to compare the limitations described in the claimant's RFC "with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 404.1560(b); *see also* SSR 82-62.  If that comparison reveals that the claimant is able to perform her past relevant work, whether as she actually performed it or as generally required by employers throughout the national economy, then the claimant is not "disabled" within the meaning of the Act and is not entitled to DIB. 20 C.F.R. § 404.1560(b)(3); SSR 82-61.  An ALJ may use the testimony of a vocational expert to offer evidence within his or her expertise concerning the physical and mental demands of a claimant's past relevant work. 20 C.F.R. § 404.1560(b)(2).

Here, the ALJ found that Glander has the RFC to perform her past relevant work as a production assembler as she performed it.  In making this determination, the ALJ sought the assistance of the vocational expert, Dr. Barkaus.  Dr. Barkaus classified Glander's past jobs as a press operator and assembler as light work, with the exception that her work as an assembler was sedentary as to the postural requirement, since she performed the job primarily from a sitting position.  Dr. Barkaus further hypothesized that based on the assigned RFC, Glander could not return to her job as a press operator since it required prolonged standing, but could perform her past work as an assembler as she performed it primarily from a sitting position, specifically articulating that the need to elevate her legs would not interfere with her work performance. (Tr. 411-12.)  As a component of her step four analysis, the ALJ specifically considered Glander's perceived barriers, discussed *supra* in Section 3, to returning to sedentary work and concluded that they were not entirely credible. *See* SSR 82-62.  As well, the ALJ properly disregarded

21

Glander's assertion that no "sit down assembly jobs" exist (*see* Tr. 394), as "step four can result in a determination of no disability without inquiry into whether the claimant's previous work exists in the national economy." SSR 05-1c at 4.

Thus, based on the record presented, the ALJ's determination at step four – that Glander's RFC did not prevent her from performing her past work as an assembler as she performed it – is supported by substantial evidence.  Accordingly, the ALJ's conclusion that Glander was not disabled within the meaning of the Act, and thus not entitled to DIB, must be affirmed.

## VI.  CONCLUSION

For the reasons stated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Glander.

SO ORDERED.

Enter for this 17th day of January, 2006.

S/Roger B. Cosbey                             
Roger B. Cosbey,
United States Magistrate Judge